UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CATHERINE "CASSIE" DAVIS and JULIA RHODES, | Case No: 21-cv-03779 SBA |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS COMPLAINT** |
| vs. | |
| INMAR, INC. and DOES 1-10, inclusive, | |
| Defendants. | |

Plaintiffs Catherine "Cassie" Davis ("Davis") and Julia Rhodes ("Rhodes") (together, "Plaintiffs") bring the instant action against their former employer, Inmar, Inc. ("Inmar" or "Defendant"). Pending is Defendant's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The matter is suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b). For the reasons stated below, the motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    FACTUAL ALLEGATIONS

Inmar is a corporation headquartered in North Carolina, with offices located throughout the country, including in California. Def.'s Req. for Jud. Notice, Exs. A-D, Dkt. 8-1; Compl. ¶ 3, Dkt. 1. Plaintiffs are California residents and former employees of Inmar, who worked in its office located in Daly City, California. Id. ¶¶ 1-2.

### 1.    Davis

Davis worked as a Creative Director for SoftCoin, which was later acquired by You Technology. Id. ¶ 13. Leading a team of designers and front-end engineers, Davis was instrumental in establishing and developing You Technology's suite of products and services. Id. ¶ 14. She also oversaw marketing and spearheaded a company rebrand (to

YouTech).  Id.  In or about March 2019, Inmar acquired YouTech.  Id. ¶ 15.  Inmar offered Davis a position as Vice President, Strategic Services, which she accepted.  Id.  She continued to report to her former supervisor, YouTech's CEO, Cheryl Black, who was "demoted" to a Vice President role at Inmar.  Id. ¶¶ 15, 26.

Davis alleges that, from the start, the "male dominated" and "male oriented" work culture became a clear obstacle for her to "establish her role and position within Inmar …." Id. ¶ 16.  For example, there were "open discussions about certain senior (male) leaders having a 'type' in regard to women they prefer to work with and that these women tended to fit a certain stereotype."  Id.  Additionally, "[i]t was well known amongst female employees that senior leaders (all male) only wanted to hear from male colleagues and that female employees would be most effective if they passed information through a straight, white, male colleague."  Id.  Davis reported this gender discrimination to her supervisor on multiple occasions, but Inmar did nothing to respond to these issues.  Id.

Months after the YouTech acquisition, Davis "inadvertently discovered" that Inmar had "demoted" her to a Director level position, despite having provided an offer letter designating her as a Vice President.  Id. ¶ 17.  She nonetheless continued to perform the duties of a Vice President.  Id.  Davis further alleges that she was actively excluded from meetings and did not receive credit for her work.  Id. ¶ 18.  When Davis raised concerns about such unfair treatment, her supervisor and/or executive leadership provided assurances regarding her job security.  Id.  Her supervisor also represented that she was working on a higher level and cross-divisional position for Davis.  Id. ¶ 19.

In or about early 2020, after the COVID pandemic hit, Davis was told that company-wide salary reductions would spare layoffs.  Id. ¶ 20.  Davis "questioned" the purported justification for the reductions, given that Inmar operated in a sector undergoing rapid growth (i.e., tech-enabled services for retailers in the grocery sector).  Id.  She also "questioned the tiered salary reduction plan to have obvious discriminatory impact on the higher-level women working in the SF/Bay Area."  Id.  Davis shared her concerns with her supervisor, who, on information and belief, did nothing to address the matter.  Id.

Within weeks of Davis raising these concerns, Inmar decided to terminate her, as well as the other highest level female leader in the office.  Id. ¶ 21.  Davis "was told Inmar did not like how much she was making."  Id.  However, male colleagues with comparable salaries and experience were spared layoffs.  Id. ¶¶ 21-22.  Davis claims the demographic makeup of the layoffs show the justifications to be "pretextual," as they targeted "high-earning and vocal women, minorities, and white employees over the age of 50."  Id. ¶ 21.  Additionally, Davis "has knowledge of at least one male colleague, performing substantially similar work, living in a more affordable city, who was compensated more than what Inmar paid her as a woman living and working in San Francisco."  Id. ¶ 24.

At the time of the layoffs, Inmar also informed Davis that there would be no new development for her division due to COVID, citing this as the basis for her termination.  Id. ¶ 23.  Yet in May 2020, Inmar issued a press release announcing the appointment of a male Executive in Residence to "accelerate the industry's digital transformation," evidencing an effort to "ramp up" development amid the pandemic.  Id.

**2.    Rhodes**

Rhodes worked as Vice President, Product Management for YouTech.  Id. ¶ 26.  At the time of YouTech's acquisition, Inmar offered Rhodes a role as Director, Product Management, which she accepted.  Id.  Rhodes was told that "down-leveling was a common practice for Inmar across the board."  Id.  However, she later came to believe that her position was "unfairly 'leveled' due to her gender."  Id. ¶ 27.  Rhodes' title was out of step with those of her male colleagues given her responsibilities; for example, one of her direct reports held the same title.  Id.  Rhodes raised the issue with her supervisor, Cheryl Black.  Id.  Black represented that she was working with HR to promote Rhodes to a title and position commensurate with her responsibilities and assignments.  Id. ¶ 28.

Rhodes observed discriminatory "leveling" and other forms of gender discrimination at Inmar, including, *inter alia*: senior male leaders having intimate relationships with women within their organizations; statements that male senior leaders had a "type" of women they preferred to work with; open discussions that male senior leaders only wanted

to hear from male colleagues; women being regularly demoted or kept in positions not commensurate with their contributions and experience; and women being paid less than men for substantially similar work.  Id. ¶ 29.  Rhodes raised these issues with her supervisor, but no action was taken.  Id.  In or about April 2020, Inmar denied Rhodes' request to promote a pregnant direct report because she was about to go on parental leave. Id. ¶ 30.  Rhodes reported to HR that she believed this to be discriminatory.  Id.

Shortly thereafter, Rhodes was terminated, under what she asserts "was the pretext of the COVID pandemic."  Id.  Although Inmar told Rhodes her layoff was due to pandemic hardship, the CEO later stated in a recorded company-wide meeting that terminations had been planned prior to the pandemic, which merely "accelerated" and/or provided an excuse for the same.  Id. ¶ 31.  In justifying her termination, Inmar also told Rhodes that the company was not planning to undertake new development in 2020.  Id. ¶ 32.  Less than a month after her termination, however, Inmar announced the appointment of a new Executive in Residence, aimed to accelerate development.  Id.  Rhodes claims Inmar hired an external, male candidate for a role she could have filled.  Id.

### 3.    Vacation Payouts

In or about March 2020, a company-wide salary reduction plan went into effect that reduced Plaintiffs' salaries by 25%.  Id. ¶¶ 20, 25, 33.  Plaintiffs were terminated effective April 16, 2020.  Id.  Inmar paid Plaintiffs for accrued vacation time at their reduced rates, even though nearly all of it accrued at their pre-COVID rates of pay.  Id. (alleging Plaintiffs received only their final paychecks at a reduced rate).  Inmar lifted the salary reduction plan in or about the end of the second quarter of 2020.  Id. ¶¶ 26, 34.

### B.    PROCEDURAL HISTORY

The Complaint alleges claims for: (1) Discrimination Based on Gender in Violation of the FEHA, Cal. Gov. Code § 12940(a); (2) Retaliation, Cal. Gov. Code § 12940(h); (3) Wrongful Termination in Violation of Public Policy; (4) Failure to Prevent Harassment, Discrimination, or Retaliation, Cal. Gov. Code § 12940(k); (5) Discrimination in Payment on Basis of Sex, Cal. Labor Code § 1197.5, by Davis only; (6) Denial of Equal Pay for

Equal Work, the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. § 206, et seq., by Davis only; (7) Fraud/Intentional Misrepresentation; and (8) Failure to Pay Wages at Time of Termination, Cal. Labor Code § 201 et seq.  Dkt. 1. Defendant moves to dismiss the Complaint under Rule 12(b)(6).  Dkt. 8.

## II.    <u>LEGAL STANDARD</u>

Rule 12(b)(6) "tests the legal sufficiency of a claim."  <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  <u>Somers v. Apple, Inc.</u>, 729 F.3d 953, 959 (9th Cir. 2013).  "Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires not only 'fair notice of the nature of the claim, but also grounds on which the claim rests.'"  <u>Zixiang Li v. Kerry</u>, 710 F.3d 995, 998-99 (9th Cir. 2013) (quoting in part <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 556 n.3 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

In assessing the sufficiency of the complaint, courts must accept its factual allegations as true and construe the pleadings in the light most favorable to the nonmoving party.  <u>Outdoor Media Group, Inc. v. City of Beaumont</u>, 506 F.3d 895, 899-900 (9th Cir. 2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are "not entitled to the assumption of truth."  <u>Iqbal</u>, 556 U.S. at 678, 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  Absent a clear showing that amendment would be futile, at least one chance to amend a deficient complaint should be given.  <u>Nat'l Council of La Raza v. Cegavske</u>, 800 F.3d 1032, 1041-42 (9th Cir. 2015).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.**    **DISCUSSION**

      **A.**    **FEHA CLAIMS**

      Plaintiffs bring claims for gender discrimination, retaliation, and failure to prevent discrimination under California's Fair Employment Practices Act ("FEHA"), Cal. Gov't Code § 12940, as well as a claim for wrongful termination in violation of the public policies set forth in that statute.

             **1.**    **Presumption Against Extraterritorial Application**

      Defendant moves to dismiss Plaintiffs' FEHA claims by invoking the presumption against extraterritorial application of state statutes.  According to Defendant, Plaintiffs fail to allege that any unlawful conduct occurred in California, and thus, cannot state a claim under the statute.  Plaintiffs respond that their claims clearly fall within FEHA's reach because they were employed in California—at Inmar's office located in Daly City—when the allegedly unlawful conduct occurred.  Plaintiffs are correct.

      State law embodies a presumption against extraterritorial application of its statutes. Diamond Multimedia Sys., Inc. v. Superior Court, 19 Cal. 4th 1036, 1059 (1999) (citing North Alaska Salmon Co. v. Pillsbury, 174 Cal. 1 (1916)).  Applying this presumption, California courts have held that FEHA does not apply to "non-residents employed outside the state when the tortious conduct did not occur in California."  Campbell v. Arco Marine, Inc., 42 Cal. App. 4th 1850, 1860 (1996); see also Cal. Code Regs. tit. 2, § 11008(d)(1)(C) ("[E]mployees located outside of California are not themselves covered by the protections of the [FEHA] if the allegedly unlawful conduct did not occur in California, or the allegedly unlawful conduct was not ratified by decision makers or participants in unlawful conduct located in California.").  Thus, for a claim to fall within FEHA's reach, a plaintiff residing outside California is "required to plead at a minimum that he was either employed in California or that the discriminatory conduct occurred in California."  Gonsalves v. Infosys Techs., LTD., No. 09-CV-4112-MHP, 2010 WL 1854146, at *5 (N.D. Cal. May 6, 2010) (citing Campbell, 42 Cal. App. 4th at 1861); accord Paparelle v. Plume Design, Inc., No. 22-CV-01295-WHO, 2022 WL 2915706, at *3 (N.D. Cal. July 25, 2022).

Defendant focuses solely on the locus of the discriminatory conduct (i.e., where any wrongdoers were located), without considering Plaintiffs' place of employment.  Indeed, as noted by Plaintiffs, "not one case cited by Inmar involves an employee who lived _and_ worked in California at the time of the alleged unlawful conduct."  Opp'n at 9-10, Dkt. 20 (citing English v. Gen. Dynamics Mission Sys., Inc., No. EDCV 18-908 JGB (SHKx), 2019 WL 2619658, at *2 (C.D. Cal. May 8, 2019), aff'd, 808 F. App'x 529 (9th Cir. 2020) (where the plaintiff's position as a field trainer required her to work at various military bases throughout the country, but not in California); Anderson v. CRST Int'l, Inc., No. CV 14-368 DSF MANX, 2015 WL 1487074, at *1-2 (C.D. Cal. Apr. 1, 2015), aff'd in part, rev'd in part and remanded, 685 F. App'x 524 (9th Cir. 2017) (where the plaintiff's position as an over-the-road commercial truck driver required lengthy trips out of state, including in Pennsylvania); Gulaid v. CH2M Hill, Inc., No. 15-CV-04824-JST, 2016 WL 5673144, at *1 (N.D. Cal. Oct. 3, 2016) (where the plaintiff was hired to work on a project on a U.S. Navy base in Djibouti, Djibouti).  The authorities cited by Defendant are thus largely inapt.

Here, Plaintiffs allege they were employed in California and subjected to discriminatory and retaliatory acts while performing work for Inmar in the state.  Such allegations are sufficient to plead a claim within FEHA's reach.  See Gonsalves, 2010 WL 1854146, at *5 (explaining that a plaintiff may plead a claim within FEHA's reach by alleging he was employed in California or performed some work in California with a connection to the misconduct at issue).

## 2.    Retaliation

Defendant separately moves to dismiss Plaintiffs' retaliation claim.  It argues that, with two exceptions, "***none*** of the purportedly retaliatory acts … were allegedly preceded by any protected activity."  Mot. at 9 (emphasis in original).  To be sure, the Complaint alleges certain adverse employment actions (e.g., demoting and/or failing to promote Plaintiffs) that appear to have occurred prior to any protected activity.  Compl. ¶ 47.  As Defendant acknowledges, however, the Complaint also alleges that Plaintiffs were

terminated *after* engaging in protected activity.  See id. ¶¶ 16, 20-21, 27, 30, 47.  Plaintiffs therefore state a claim for retaliation based on those terminations.[1]

Defendant argues Plaintiffs nonetheless fail to state a claim because they do not rebut the "obvious alternative explanations" for the terminations, i.e., that Inmar laid off personnel to "blunt the economic damage dealt by COVID."  Mot. at 9-10, 1.  Defendant misapprehends Plaintiffs' burden in pleading a FEHA claim.  See Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005) (describing three-step burden shifting framework for analyzing FEHA claims and setting forth elements of a prima facie case of retaliation).  Plaintiffs allege facts to support the inference that their terminations were motivated by retaliatory animus, i.e., they were laid off within weeks of engaging in protected activity.  They further allege facts tending to show Inmar's stated reasons were pretextual, i.e., male colleagues were spared layoffs despite poorer job performance and comparable salaries; layoffs targeted high-earning and vocal women; Inmar hired a male executive shortly after the layoffs, undermining its claim of curbing development; and the CEO stated layoffs were planned prior to the pandemic.  This is more than sufficient to survive a motion to dismiss, as Plaintiffs need not rebut non-retaliatory reasons for the terminations at this juncture.  Accordingly, the motion to dismiss Plaintiffs' FEHA claims is denied.

## B.   EQUAL PAY CLAIMS

Davis brings claims for violations of the state and federal Equal Pay Acts, which prohibit sex-based wage discrimination.  29 U.S.C. §206; Cal. Labor Code § 1197.5(h).  The federal Equal Pay Act provides that no employer shall discriminate by paying different wages to employees of opposite sexes within an establishment for jobs that require substantially equal skill, effort, and responsibility, and which are performed under similar working conditions.  29 U.S.C. § 206(d)(1); E.E.O.C. v. Maricopa Cty. Cmty. Coll. Dist., 736 F.2d 510, 513 (9th Cir. 1984).  The California Equal Pay Act is nearly identical to the

---

[1] Defendant also acknowledges that Plaintiffs' salaries were reduced following the alleged protected activity.  Mot. at 9.  However, Plaintiffs do not identify the salary reductions as an adverse employment action.  See Compl. ¶ 47; see also Opp'n at 11-12.

federal statute and subject to the same analysis.  Green v. Par Pools Inc., 111 Cal. App. 4th 620, 623 (2003) (citing Cal. Lab. Code § 1197.5).  Defendant moves to dismiss Davis' equal pay claims on the ground that she fails to plead sufficient facts to support the same.

The Complaint alleges that Davis "has knowledge of at least one male colleague, performing substantially similar work, living in a more affordable city, who was compensated more than what Inmar paid her as a woman living and working in the San Francisco, Bay Area." Id. ¶ 24.  This is deficient for at least two reasons.  First, that an unidentified comparator performs "substantially similar work" is a legal conclusion.  See Werner v. Advance Newhouse P'ship, LLC, No. 1:13-CV-01259-LJO, 2013 WL 4487475, at *5 (E.D. Cal. Aug. 19, 2013) (dismissing claim for violation of Equal Pay Act where the plaintiff alleged only that she was paid less than similarly situated male employees).  Davis fails to plead facts showing her and her comparator's roles required substantially equal skill, effort, and responsibility, and were performed under similar working conditions.

Second, the Complaint compares Davis to a single male employee, without alleging facts to support such a limited comparison.  See Hein v. Oregon Coll. of Educ., 718 F.2d 910, 918 (9th Cir. 1983) (providing a single comparator is appropriate only when there are no other opposite-gender employees performing similar work); Duke v. City Coll. of San Francisco, No. 19-CV-06327-PJH, 2020 WL 512438, at *7 (N.D. Cal. Jan. 31, 2020) (dismissing claim based on a single comparator with leave to amend to allege lack of other comparators).  Accordingly, the motion to dismiss Davis' equal pay claims is granted.[2] Because the claims may be saved by amendment, they are dismissed with leave to amend. See Malibu Textiles, Inc. v. Label Lane Int'l, Inc., 922 F.3d 946, 954 (9th Cir. 2019).

---

[2] Defendant also argues that the Equal Pay Act's "single establishment" requirement is not satisfied because Davis and her sole comparator work in different offices/cities. Plaintiffs do not respond to this argument.  Notably, however, geographically separate offices may be treated as a single establishment where they are operationally interrelated. See Russell v. Placeware, Inc., No. CIV. 03-836-MO, 2004 WL 2359971, at *8 (D. Or. Oct. 15, 2004) (citing 29 C.F.R. § 1620.9; Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1464 (9th Cir. 1985)); Winther v. City of Portland, No. CIV. 91-1232-JU, 1992 WL 696529, at *3 (D. Or. June 10, 1992), aff'd, 21 F.3d 1119 (9th Cir. 1994).  Thus, the fact Davis and her comparator work in different offices/cities does not itself warrant dismissal of the claims.

1

### C.   FRAUD CLAIM

2

Plaintiffs bring a claim for fraud.  The elements of fraud are: (1) misrepresentation,

3

i.e., false representation, concealment, or nondisclosure; (2) knowledge of falsity; (3) intent

4

to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.  Small

5

v. Fritz Companies, Inc., 30 Cal. 4th 167, 173 (2003).  Rule 9(b) requires that the

6

circumstances constituting fraud must be pled with particularity.  In other words,

7

"[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of

8

the misconduct charged."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.

9

2003) (citation omitted).  Where fraud is alleged against a corporate entity, a complaint

10

must allege the name of the person who made the fraudulent statement, their authority to

11

speak, to whom they spoke, what was said or written, and when the communication

12

occurred.  Zetz v. Bos. Sci. Corp., 398 F. Supp. 3d 700, 714 n.4 (E.D. Cal. 2019) (citing

13

Tarmann v. State Farm Mut. Auto. Ins. Co., 2 Cal. App. 4th 153, 157 (1991)).

14

Defendant moves to dismiss this claim on the ground that Plaintiffs fail to satisfy the

15

heightened pleading standard of Rule 9(b).  As noted by Defendant, the Complaint sets

16

forth various alleged misrepresentations.  See Compl. ¶ 89.  Plaintiffs largely fail to allege

17

that they relied on the same or resulting damages.  For example, although Davis claims that

18

Inmar falsely offered her the title of Vice President, she does not allege that she would have

19

rejected a Director title.  To the contrary, Davis alleges that, even after discovering she had

20

been "de-leveled" to Director, she continued in her employment.  Id. ¶ 17.

21

Plaintiffs' opposition as to this issue is deficient.  See Opp'n at 14-15.  The only

22

misrepresentation for which Plaintiffs attempt to defend their allegations of reliance and

23

resulting damage is a statement made in or about March 2020 that salary reductions would

24

spare layoffs.  Id.  As alleged in the Complaint, this statement induced Plaintiffs' agreement

25

to a 25% salary reduction that was in effect at the time of their termination.  Compl.

26

¶¶ 89(c), 90(c).  Plaintiffs now assert that, had they decided to leave Inmar instead of

27

accepting the salary reduction, accrued vacation time would have been paid out at their

28

"pre-reduction rate of pay."  Opp'n at 14-15.

As an initial matter, the Complaint does not allege that Plaintiffs would have left their positions had they not been told salary reductions would spare layoffs; nor does it explicitly include the allegation that they were harmed by the decision to remain at Inmar due to a reduction in their vacation payouts.  See Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (facts raised for the first time in an opposition brief cannot be considered on a motion to dismiss).  Moreover, the Complaint does not allege who at Inmar made this statement or their authority to speak on behalf of the company.  Accordingly, Defendant's motion to dismiss Plaintiffs' fraud claim is granted.  Because the claim may be saved by amendment, it is dismissed with leave to amend.  See Malibu Textiles, 922 F.3d at 954.

### D.     FAILURE TO PAY WAGES

Finally, Plaintiffs bring a claim for failure to pay accrued vacation time.  Defendant moves to dismiss this claim on the ground that the Complaint does not allege a violation of, but rather compliance with, the relevant law.  California Labor Code § 227.3 provides that, "whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate …."  Noting that the Complaint alleges payment of accrued vacation time at the rate reflected in Plaintiffs' final paychecks, Defendant argues that a claim for violation of § 227.3 cannot be maintained.

Plaintiffs do not dispute that their accrued vacation time was paid at the rate reflected in their final paychecks.  They note, however, that because vacation is a form of wages, it is earned as labor is performed.  See Cal. Lab. Code § 200(a) (defining "wages" as "all amount for labor performed"); Murphy v. Kenneth Cole Productions, Inc., 40 Cal. 4th 1094, 1103 (2007) (recognizing that "wages" include benefits to which an employee is entitled as a part of her compensation, including vacation pay).  Plaintiffs further note that, in resolving any dispute regarding vested vacation time, "the principles of equity and fairness" shall be applied.  Cal. Lab. Code § 227.3.  Plaintiffs invoke these principles in arguing that their accrued vacation time should have been paid at their final rate of pay before the temporary salary reduction plan went into effect.

At this juncture, Plaintiffs' claim for failure to pay wages at termination shall not be dismissed.  Though the parties do not frame the issue in this manner—but rather, as a conflict between the plain language of the statute and equitable principles—the claim can be said to hinge on the question of what constitutes Plaintiffs' final rate of pay.  See, e.g., Cinnamon Mills v. Target Corp., No. EDCV 20-1460 JGB (KKx), 2020 WL 6526361, at *3 (C.D. Aug. 28, 2020) (denying motion to dismiss claim under § 227.3, noting "the crux of this dispute is how the 'final rate' of vacation pay is defined," i.e., whether it constituted the "base hourly rate" or also included an "hourly shift differential").  Defendant asserts no violation may be alleged because the Complaint admits payment of accrued vacation time at the rate at which Plaintiffs' final paycheck issued.  However, the Complaint also alleges that a temporary salary reduction plan went into effect just prior to Plaintiffs' terminations (and was then lifted only two months later).  On these facts, it can be maintained that Plaintiffs' "final rate" is that paid before any salary reduction is applied.  Accordingly, Defendant's motion to dismiss this claim is denied.

## IV.   CONCLUSION

In view of the foregoing, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted in part and denied in part, as set forth above.  The fifth, sixth, and seventh claims for relief are dismissed with leave to amend.  Plaintiffs may file a first amended complaint within 21 days of the date this order is issued.  No new parties or claims may be added without prior leave of the court.

IT IS SO ORDERED.

Dated: August 29, 2022

_Saundra B Armstrong_ RS
Richard Seeborg for Saundra B. Armstrong
United States District Judge